# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>LATWON T. MOSBY ) | Case No. CR414-307 |

## REPORT AND RECOMMENDATION

Indicted on gun-possession charges, doc. 1, Latwon T. Mosby moves to suppress the evidence against him. He contends that the police who seized and searched him violated his Fourth Amendment rights. Doc. 14.

## I. BACKGROUND

On the afternoon of March 28, 2014, Savannah-Chatham Metropolitan Police Officers Chris Tucker and Chris Samatis conducted a regular foot patrol at the Westlake Apartments, located in a high-crime area of Savannah, Georgia. Doc. 30 (partial suppression hearing transcript ("Tr.")) at 6-7. Management for that two-story complex had entered into a "Citizen's Agreement" with the police for an "extra patrol in the area" because of the large amount of drug activity on the premises. *Id.* at 6. The police were invited "to question people that are on the

property premises to see if they actually live there." *Id.* at 7. The intent was to charge loiterers with criminal trespass in order to discourage drug-dealing at the apartment complex. *Id.*[1] While the extra patrols had had a positive effect, criminal activity was still ongoing in March 2014. The two policemen thus went to the apartments "to walk, talk, [and] see if there was anybody just loitering around selling narcotics. And we just -- we drove there and got out on foot and started walking." *Id.* at 7.

At the very back of the complex, the two officers noticed someone above them on the second story breezeway (an open hallway between apartments). *Id.* at 7-8. When that person descended one of the two stairways, *id.* at 8-9, he was met by the uniformed officers. Tucker, whose testimony is unrebutted, detailed the ensuing encounter:

> A. We waited for a second. And then Mr. Mosby walks down the stairs on my side, and I initiate a conversation with him.
>
> Q. What did you say?
>
> A. I asked him -- I said, "Do you stay here?"
>
> . . .

---

[1] On this point the Court also is relying upon the testimony of the then property manager, Jeanie Strickland, though her testimony had not yet been transcribed.

He said, "Yeah." His response was, "Yeah."

And so I said, "Well, what apartment?"

And he stalled, started to look around.

I said, "Do you have an I.D.?" because, at that point, I knew that he was searching for answers. He was stalling, trying to figure out where he stayed -- or what apartment building he was actually at.

Q. And as you answered that question, you made a gesture with your head which -- can you just put in words --

A. Correct. He started to look around as if he was looking for answers. He was looking, like, left, looking right, trying to see an apartment building number to give me. He didn't know what apartment he was at.

And so I just -- quickly just changed it to a different question, "Do you have any I.D. to show that you live here?"

And as soon as I asked that, he turned and ran.

Q. And which direction did he run?

A. He ran back into the breezeway. But he didn't realize Officer Samatis was right behind him, because once I made contact, Samatis had walked up behind us as a officer cover position.[2]

And as soon as he turned, he ran right into the arms of Officer Samatis. And as he turned, he reached with his right hand to his right pocket, and I yelled, "Gun," because I could see the handle of the gun.

---

[2] Officer Samatis testified that both officers "met" Mosby as he came down stairs, suggesting that Mosby knew there were two officers from the outset of the encounter. This slight discrepancy in the testimony has no bearing on the Court's analysis.

3

> And so Officer Samatis wraps him up around the arms. His hand is in his pocket on the gun. And Samatis holds him -- wraps him up in, like, a bear hug technique and takes him to the ground. I'm yelling, "Gun."
>
> And he's -- Mr. Mosby's still -- he's saying, "I've got asthma. I've got asthma. It's my cell phone. It's my cell phone."
>
> And I told Samatis, "No. It's a gun. Don't let him go."

*Id.* at 9-11. After Mosby was subdued, the officers seized a 9 mm semi-automatic pistol from his right pocket. *Id.* at 11-13, doc. 14-1 at 3.[3] They then placed him under arrest.

## II. ANALYSIS

Mosby recognizes that the initial approach and questioning by the officers was a lawful police-citizen encounter not subject to Fourth Amendment scrutiny. Doc. 14 at 2; *see Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *Florida v. Bostick*, 501 U.S. 429, 434 (1991)

---

[3] Any factual assertions in Mosby's brief that are not supported by the record have been disregarded. In that regard, he has failed to comply with S.D. Ga L. Cr. R. 12.1 ("Where allegations of fact are relied upon that are not supported by the existing record, supporting affidavits shall be submitted."); doc. 20. *See United States v. Verch*, 307 F. App'x 327, 330 (11th Cir. 2007) (upholding this Court's denial of an evidentiary hearing for want of a L. Cr. R. 12.1 affidavit).

4

("mere police questioning does not constitute a seizure"). He claims, however, that the officers "became infuriated when [he] attempted to exercise his constitutional right to terminate that encounter," doc. 14 at 2, and that their refusal to allow him to do so constituted an "unconstitutional enhancement of a first-tier encounter to a second tier encounter" without any reasonable suspicion to believe that he was engaged in criminal activity.[4] *Id.* at 3.

It is undisputed that Mosby attempted to terminate the initial, consensual encounter by fleeing from the officers after they asked to see some identification. Only then did the officers lay hands upon the defendant, effectively seizing him for Fourth Amendment purposes. The question before the Court is whether, at that point, the officers had a

---

[4] Encounters between police and citizens have been categorized into three types or "tiers": (1) merely consensual encounters which involve no restraint on the citizen's liberty and, therefore, lie outside the protective scope of the Fourth Amendment, (2) brief, investigatory detentions of the citizen based on a "reasonable suspicion" of criminal activity, and (3) full-scale arrests that must be supported by probable cause. *United States v. Jordan*, 635 F.3d 1181, 1185-86 (11th Cir. 2011); *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir. 1986); *United States v. Berry*, 670 F.2d 583, 591, 594 (5th Cir. Unit B 1982) (en banc); *see Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). Determining where a particular encounter falls on the spectrum, and consequently when such an encounter is subject to Fourth Amendment strictures, requires an examination of "all of the circumstances surrounding the encounter." *Bostick*, 501 U.S. at 437.

sufficient reasonable suspicion of criminal activity to support an investigatory detention. Reasonable suspicion requires that officers possess a "minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

The police-citizen encounter in this case occurred in an area of Savannah where crime is prevalent; indeed, the manager of the apartment complex had specifically asked for extra police patrol due to the presence of loiterers and drug activity on the property. While Mosby's mere presence in an area of expected criminal activity was alone insufficient to support a reasonable suspicion that he was committing a crime, the fact that the encounter occurred in a high crime area "is a relevant contextual consideration in a *Terry* analysis." *Id.* at 124. Of far more critical significance, however, is the fact that Mosby gave an evasive and apparently false answer to Officer Tucker's simple question of whether he lived at the apartment complex. Although Mosby claimed to reside there, as soon as the officer asked "which apartment," Mosby hesitated and began to look around as if searching for a building or

apartment number to provide in response. Recognizing that he was not likely to receive a truthful answer, the officer then asked to see some identification. Mosby immediately tried to flee.

Mosby's evasion, when considered together with his attempted flight and the fact that the police-citizen encounter was in a high-crime area, clearly established the necessary level of suspicion to justify his detention for further investigation. Officers may rely upon their commonsense, as informed by their training and experience, when determining whether they have the authority to seize a citizen whom they suspect of criminal activity. *Wardlow*, 528 U.S. at 125 ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."). Certainly, "evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* at 124. In *Wardlow*, the evasion consisted solely of defendant's sudden and unprovoked flight from police officers who were on patrol in an area of Chicago known for heavy narcotics trafficking. Here, too, Mosby fled from the police in a high-crime area, but at the time he did so he had already given an evasive and apparently false answer to the officer's question about his place of residence. In addition, his flight was preceded by his refusal to

comply with the officer's lawful request that he produce some identification. The Court is satisfied that these separate acts of evasion -- both highly relevant factors not present in *Wardlow* -- places this case on a far more solid reasonable-suspicion foundation. In *Wardlow* the defendant's flight was itself the only act of evasion known to the officers; here, the defendant engaged in transparently deceptive conduct even prior to his flight.[5]

The officers in this case were justified in briefly detaining Mosby in order to confirm or dispel their legitimate, reasonable suspicion that he was engaged in criminal activity. Mosby's motion to suppress, therefore, should be **DENIED**.

---

[5] The *Wardlow* Court noted that, as in that case, "the conduct justifying the stop [in *Terry*] was ambiguous and susceptible of an innocent explanation." *Wardlow*, 528 U.S. at 125. All of the conduct observed by the officer in *Terry* -- "two individuals pacing back and forth in front of a store, peering into the window and periodically conferring" -- "was by itself lawful," although to that highly experienced officer the conduct simply "didn't look right." 392 U.S. at 5. In this case, the officers were confronted by conduct far less susceptible of any innocent explanation, for it is highly unlikely that a person not engaged in any wrongdoing would want to lie to the police about his place of residence and then endeavor to flee from the officers when asked to produce identification confirming his dubious story. But even if Mosby's behavior could be deemed to be as ambiguous as the conduct at issue in *Wardlow* and *Terry*, the officers were warranted in detaining him in order to "resolve the ambiguity." *Wardlow*, 528 U.S. at 125.

**SO REPORTED AND RECOMMENDED** this 16th day of October, 2014.

/s/ M. Smith
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA